672 A.2d 1364

**In re the BARNES FOUNDATION, a Corporation.**

**Appeal of BARNES FOUNDATION and its Trustees ("Foundation").**

Superior Court of Pennsylvania.

Argued May 16, 1995.

Filed March 15, 1996.

82

Bruce W. Kauffman, Sheryl L. Auerbach, and Lynn R. Rauch, Philadelphia, for appellant.

Arthur L. Jenkins, Jr., Norristown, for Students of the Barnes Foundation, participating party.

Lawrence Barth, Deputy Attorney General, Philadelphia, for the Commonwealth, participating party.

J. Brooke Aker, Norristown, for Friends of the Barnes Foundation, participating party.

Carol S. Buechner, Philadelphia, for Alfred A. Knopf, Inc., participating party.

Before ROWLEY, President Judge *, TAMILIA and SAYLOR, JJ.

TAMILIA, Judge.

This Opinion follows our Judgment Order Per Curiam of May 17, 1995, which authorized the Barnes Foundation Trustees to permit off-site exhibition of selected works of art owned by the Barnes Foundation. Allocatur to the Supreme Court was requested following our May 17th Order and was denied on May 26, 1995. *In re Barnes Foundation,* 541 Pa. 649, 664 A.2d 539 (1995).

* Former President Judge Rowley participated in the oral argument held in this matter and joined in the Judgment Order entered on May 17, 1995; however, due to his subsequent retirement from the court he did not participate in this opinion.

While the *Barnes Foundation* appeal at No. 00794 Philadelphia, 1994, was held to be moot in this Court's Order of March 8, 1995,[1] and in *In re The Barnes Foundation*, 443 Pa.Super. 369, 661 A.2d 889 (1995) (*Barnes I*), the emergency appeal and hearing at No. 01641 Philadelphia, 1995, was timely and brings us to a basic consideration of the issues posed by Friends of Barnes (hereinafter Friends) and of Barnes Students (hereinafter Students). Considering the issue raised by the Trustees as to the role of the Students in this appeal, as stated in *Barnes I* at No. 02605 Philadelphia, 1994, the students have no standing. This is so for either of two reasons. At the time of *Barnes I*, the Students, represented solely by Nicholas Tinari, had no standing as Tinari was not a student at the time, having been expelled. This Court also held in *Barnes I* at No. 02085 Philadelphia, 1993, that mandamus did not lie for Tinari's reinstatement, and as a matter of contract, no breach of contract was alleged or proven for termination of the student status. The grounds for termination were found to be on-going, vexatious and substantial and neither the trial court nor this Court would intervene in a decision by the trustees to suspend under those facts. Even though reinstatement might have occurred prior to the instant appeal, the Students have no standing on the issues of this case because their appointment to the Board of Trustees ad litem by Judge Stefan was purely for the limited purpose to provide the court with facts about the educational process and curriculum of the Foundation's Art Department from the perspective of current and future students. Unfortunately, the Students have used this wedge to engage in what must be described as frivolous and harassing conduct which has done nothing but run up attorneys' fees for the Foundation. (Slip Op., Stefan, J., 8/9/91.) Based upon the ruling of Judge Stefan and this Court on appeal, the trial court erred in refusing to grant preliminary objection as to "student" participation. The matter of standing is jurisdictional and may not be waived by the court refusing to decide the case on a technical basis (Judge Ott,

1. Although the Opinion in *In re The Barnes Foundation*, 443 Pa.Super. 369, 661 A.2d 889 (1995), indicates the Order was filed on March 8, 1995, the Order as filed by the prothonotary is dated March 10, 1995.

T.T., 5/10/95, p. 6), but electing to proceed on the merits. The Trustees objected to that disposition, preserving the issue on the record (T.T. at 8), thereby requiring our disposition of that issue on appeal.

As to the standing of the Friends of Barnes Foundation, the Foundation likewise raised an issue as to their standing which was also ignored by the court in its dismissal of all preliminary objections. This issue was likewise preserved for appeal by the Foundation. Prior to ruling on that issue, the case was considered on the merits by the panel of this Court as it appeared to be the propitious means of expediting an emergency appeal when the record was not available to determine the standing issue as to the "Friends." This Opinion will focus on the merits which required resolution by the trial court as part of a continuum of the preceding cases and the several petitions to permit loans and touring of the art considered by Judge Stefan. The trial court proceeded to hear the request of the trustees to extend the venue, permitting the Students and Friends to contest this action. Nothing in the record subsequently forwarded to this Court established that the Friends have standing. Having issued our Per Curiam Order on the assumption that they did have standing, we will proceed to support that Order on the merits, as though they did have standing. Only in the Procedural Background Statement of the Adjudication and Decree of February 1, 1994 is there a reference to Friends of Barnes in conjunction with the Violette de Mazia Trust as co-protagonists requesting denial of the petition by the trustee. It would appear the de Mazia Trust has standing and as a "Friend of Barnes" it permits this matter to go forward on the merits. Treating these cases as a continuum, there is a basis for according standing to the Friends of Barnes, as including the de Mazia Trust, Violette de Mazia was the long-time assistant, co-author and traveling companion of Dr. Barnes, who was given special status in the Barnes indenture. Her trust, following her decease, was designed to continue the support and interest in the Foundation she manifested during her life and pursuant to the Foundation indenture.

As to Friends of Barnes, we have held in the previously entered Per Curiam Order of May 17, 1995, following the emergency argument conducted by conference call before a panel of this Court, that the reasoning of Judge Stefan, as applied to new facts, controls in this case with the same opportunities (gain without harm) central to Judge Stefan's decision. Judge Ott, who assumed jurisdiction upon the death of Judge Stefan, deviated from Judge Stefan's analysis, which is the law of the case, and withdrew to a technical application of the trust agreement which would have unnecessarily denied the Foundation the ability to enlarge its endowment and protect what could be an inevitable defeasance of the trust based upon a corpus which fails to earn sufficient income to fulfill the dominant intent of the trust to preserve the art works intact and to teach students.

The 1922 trust agreement provided for no loans of the art and preservation of the art in the building created for that purpose and to educate students. When two purposes of a trust become conflicted and the dominant intent of the trust to preserve the institution created by the trust becomes imperiled, some provisions of the trust, such as a no-loan policy, must give way to the dominant purpose if this can be done reasonably. *In re Mears Estate*, 299 Pa. 217, 149 A. 157 (1930) (Equity will prevent failure of definite charity by employing other means, where necessary, to carry out substantial intention of donor). The role of the Court is to look back to the mind of the settlor of the trust, to determine what he would have done when faced with conditions which were unanticipated at the time of the creation of the trust and nearly as possible to fulfill the intention of the conveyor. *In re Bodine's Trust*, 429 Pa. 260, 239 A.2d 315 (1968). Blind adherence to the terms of the trust agreement could result in the trust losing its public non-tax status and financially defaulting to the point the art works sought to be preserved in the Barnes Foundation would be sold off or assigned to some other institution which would not respect the wishes of Dr. Barnes and might in fact be the very institutions he had strongly opposed during his lifetime. The Friends of Barnes

and the Students espouse a principle of blind adherence to the trust agreement despite clearly inevitable destruction of the Foundation and total denial of an inherent public interest in preserving the trust and its tax exempt status. The Barnes Foundation is no stranger to litigation and early on it was threatened with oblivion for failure of the settlor to accommodate the public interest which was essential to tax exempt status. Through intervention by the Commonwealth of Pennsylvania, this crisis was resolved. *See Barnes Foundation v. Keely,* 314 Pa. 112, 171 A. 267 (1934). The administrative scheme adopted by the settlor was approved at that time, but it did not acquire a mantel of impenetrable insulation incapable of being adjusted to a change of cultural, social and economic factors.

The administrative scheme provided two conditions which became the source of internal tension because of changing conditions, inflationary pressures, unanticipated additional expenses and the passage of time. The original trustees, pursuant to the trust indenture and because of close identity with Dr. Barnes and his philosophy, were extremely conservative and due to limitations on investments, were unable to expand the endowment in relation to the increased costs and needs of the Foundation over the many years of their administration.

Judge Ott, in disregarding the approach taken by Judge Stefan who recognized the need to bring the settlor's intent into equilibrium and thereby assure the continuity of the Foundation, applied the technical wording of the agreement to the detriment of the settlor's intent to perpetuate the art collected by the Barnes Foundation for the distant future generations of students and the public. This was an abuse of discretion and violated the law of the case established by the two decrees entered by Judge Stefan which were sustained on appeal.

A careful review of the history of this case, involving prior litigation leading to the loan of paintings to various venues, establishes the following, pursuant to the petition of the

Trustees to exhibit art at an additional premises, a European Museum:

1.  On July 21, 1992, [the Court of Common Pleas, Orphans' Court Division,] issued an Adjudication and Decree permitting a one-time exhibition tour of selected works of art "between April, 1993 and September, 1995, at the National Gallery of Art in Washington, D.C., and at appropriate International and National Art Institutions, in accordance with the testimony produced at time of hearings".

2.  On February 21, 1994, [the Court of Common Pleas, Orphans' Court Division,] issued an Adjudication and Decree Sur Petition of Richard H. Glanton, Esquire, et al., for Approval of Exhibition of Works of Art at the Kimbell Art Museum and the Art Gallery of Ontario.

3.  While the exhibition which [was] underway at the Philadelphia Museum of Art [and] scheduled to close on April 23, 1995, renovations at the [Barnes] Foundation [was not to be completed when originally anticipated]. The reinstallation of the collection [which was anticipated to begin in April, was put off until] October 1995 and [was to] be completed, with the planned official reopening scheduled for October 14, 1995.

4.  Pursuant to their fiduciary obligations, the Trustees [petitioned the Court alleging] that the Foundation [was] presented with an opportunity to receive substantial additional funds for exhibition of works of art at an additional premier art museum in Europe.

5.  Exhibition at [that] museum, which would take place on or about June 1, 1995 through September 30, 1995, would not delay completion of the renovations or reopening of the Foundation.

6.  [That] museum is a premier facility with personnel qualified to safely handle, exhibit and secure the Foundation's art in a suitable environment.

7.  Exhibition of works of art at [that] facility, . . . would be supervised and regularly checked by curators and security guards, [thereby] safeguard[ing] the works and pro-

mot[ing] education and the appreciation of the fine arts, while the renovations at the Foundation are being completed.

Pursuant to the petition to extend the tour, Judge Ott took testimony from relevant individuals concerning the tour, its conduct, protection benefit, and detriment to the Barnes Foundation on May 10, 1995.

At the outset, Judge Ott stated he would deal with a motion to quash within the framework of the procedure established by Judge Stefan (T.T., 5/10/95, p. 9). By implication, Judge Ott adopted the procedural if not substantive scheme established by Judge Stefan. Despite considerable antagonism and heated personal interchange between counsel and witnesses, the essential facts were elicited which permit a clear application of law to an appropriate disposition.

Our careful review of the record supports the findings of fact by the trial court as detailed below.

An all day hearing convened on May 10, 1995. At the outset, the Court announced it was dismissing all the preliminary objections. Thereafter, testimony was produced in support of the petition.

In addition to the findings of facts set forth in the Court's Adjudications of July 21, 1992 and February 1, 1994, the Court makes the following:

## FINDINGS OF FACT

1. The Trustees seek approval to add an additional venue, viz., the Haus der Kunst in Munich, Germany.

2. The Haus der Kunst is a premier art facility qualified to handle, exhibit and secure the Foundation's art in a suitable environment.

3. The proposed exhibit would include between eighty and eighty-three of the paintings included in the previous venues but would not include *The Models* by Georges Seurat or *La Danse* by Henri Matisse.

4. Negotiations surrounding the proposed exhibition began in February of 1995.

5. Although a written draft of an agreement containing all pertinent terms has passed between the Trustees and the Haus der Kunst, no contract has been executed.

6. The proposed addition venue would produce $2,250,-000 in revenue for the Foundation and would provide insurance coverage for the exhibited works of art.

7. The Haus der Kunst would be responsible for expenses attendant to the exhibition.

8. The Foundation proposes that the exhibition at the Haus der Kunst will take place from June 15, 1995, through October 15, 1995, with the exhibited paintings being returned to the Foundation by the end of October 1995.

9. Ideally, the Haus der Kunst would require six months advance notice of the exhibit's availability in order to make all appropriate arrangements; in all events, a decision as to the proposed exhibition must be made immediately.

10. The exhibition paintings are presently stored in the administration building of the Foundation.

11. The renovations to the Foundation are seventy percent (70%) completed and are expected to be finished by the end of August.

12. Reinstallation of the Foundation's art is expected to commence in late August or early September 1995.

13. The anticipated final cost of the renovations has increased to $11,100,000.

14. Exhibitions of the selected paintings at the six completed tour venues has generated revenues for the Foundation of approximately $14,600,000.

15. The Office of the Attorney General as *parens patriae* for charities approves the idea of the tour to Germany, subject to certain conditions relating to the paintings' suitability for travel and the use of the tour's proceeds.

16. The Foundation has not engaged in significant development efforts beyond those related to the one-time tour authorized by this Court.

We take exception to the finding by the trial court that the Students have standing for the reasons given above, and the

court's dismissal of the Trustees' preliminary objections as to the Students appears to be unsupported.

Additionally, the court ignored perhaps the most significant fact established of record, that the paintings would not be shown to the public nor available to the Students until late October, 1995, because they would remain in storage until that time, whereas, with approval of the Haus de-Kunst showing, they would be earning 2.5 million dollars (T.T., Glanton, pp. 84–85). The September opening would be limited to classes probably in the administration building rather than the galleries, until the pictures were hung (T.T. at 85).

Judge Ott, in his adjudication and decree, recognized the efficacy of Judge Stefan's reasoning in his two adjudications, the first in 1992 authorizing "a single tour" limited to the period of any renovations in order to raise revenues to cover repairs. Judge Stefan had found an internal and irreconcilable conflict in the trust indenture between paragraphs 16 and 30. Paragraph 16 provides:

16. All of the buildings and improvements of Donee shall at all times be kept in first class order and repair.

Paragraph 30 provides

30. It shall be incumbent upon the Board of Trustees of Donee to make such rules and regulations that will protect the works of art in the gallery and the trees, shrubs and plants constituting the said arborater.

Judge Stefan, in Finding of Fact # 55, stated:

55. Without the tour, the Foundation, which is operating at a deficit, lacks the financial resources to pay for the renovations necessary to maintain the Foundation facilities and collection. [N.T. 5/21/, pp. 21, 51, 111, 126, 132, 133, 254, 258; N.T. 6/9; Ex. B–8]

Judge Stefan, in Discussion of the Decree dated July 21, 1992, stated:

It is difficult to believe that a man of Dr. Barnes' erudition would not have anticipated that the day would come when the structure he had created to house his collection would require such fundamental structural repairs and ren-

ovations as would make impossible the uninterrupted display of the collection as mandated by the Indenture. If such were his thought and desire, then history should tell us that an inevitable conflict with reality eventually would occur. The testimony is overwhelming that, after the passage of many decades, a basic overhaul of the Foundation buildings and systems is required if the very reason for their existence—housing and protection of the collection—is not to be frustrated by the ravages of an unfriendly environment.

Following this observation, Judge Stefan went on to find:

A serendipitous circumstance has presented itself to the Foundation: a singular opportunity to restore, protect, and display a portion of the collection, while procuring a substantial sum of moneys to be applied to the required renovation project. The testimony is clear that this opportunity is indeed unique; and, if lost, might not come again. The limitation on investments imposed by Dr. Barnes has not well-served the Foundation; rather, and ironically, this is a factor which now militates in favor of seizing the opportunity at hand.

Decree at p. 14.

In so finding, the Court held there was no need to amend the Indenture and that approval of a *single* tour *limited to the period of renovations* can and should be accomplished by court Order pursuant to 20 Pa.C.S. § 6110(a), Administration of charitable interests,[2] upon the express conditions that fol-

---

2. Section 6110(a) provides as follows:

(a) **General rule.**—Except as otherwise provided by the conveyor, if the charitable purpose for which an interest shall be conveyed outright or in a testamentary or inter vivos trust shall be or become indefinite or impossible or impractical of fulfillment, or if it shall not have been carried out for want of a trustee or because of the failure of a trustee to designate such purpose, the court may, on application of the trustee or of any interested person or of the Attorney General, after proof of notice to the Attorney General when he is not the petitioner, order an administration or distribution of the interest for a charitable purpose in a manner as nearly as possible to fulfill the intention of the conveyor, whether his charitable intent be general or specific.

lowing the completion of the renovations, the paintings be returned to their places on the walls as directed by Dr. Barnes, and the provisions of the Indenture reinstated in full. (Adjudication and Decree, 7/21/92, pp. 14–15.)

This is the heart of the authorization for permitting paintings of the Barnes Foundation to be placed on tour. When the Trustees again petitioned the court (Stefan, J.) to extend the tour, the court found it expedient to do so because the cost of renovation had escalated, the amount to cover those costs could be recovered by extending the tour to additional venues, the original parameters would still be operative, that is a *single tour during the period of restoration,* and the need to cover the restoration expenses. Thus in the Adjudication and Decree of February 1, 1994, the trial court simply extended an established policy to cover new and fortuitous circumstances to achieve the already approved result. In addition, the likelihood of harm to the paintings would be de minimus as the best professional safeguards were employed to insure their safety and the number of paintings exhibited was limited to 83 out of the total collection in excess of 2,000.

This brings us to the petition in the present case. What is different about the facts of this case is that the money to be obtained from extending the tour and venue to Germany would be in excess of the amount that was needed for present restoration. However, the major operative fact is that the tour would take place during the period when restoration was still in process, and the mandate of the 1992 decree to have the paintings permanently returned to their places at the Barnes Foundation by completion of restoration of the buildings would still be met. The Order by Judge Stefan that the proceeds of the tours, and any excess over the amount needed for restoration, be retained in a special account for purposes of restoration present *and future,* and not to be used for operating expenses, is crucial and remains intact. While we are bound by Judge Ott's findings of fact absent gross abuse of discretion, we are not bound by his conclusions of law. We find he was in error in concluding that extension of the tour was impermissible because cost of restoration had been met,

when an equally significant finding by Judge Stefan, which continues to be binding in this case, is that the tour may be conducted throughout the period of restoration when the paintings could not be displayed at the Barnes Foundation. To deny the additional venue in Germany, and the possibility of obtaining $2,500,000 additional funds for future restoration, while permitting the paintings to remain in storage, would be unconscionable. Seventy years elapsed from the time of the Indenture and the establishment of the endowment for maintenance of the buildings and art work of the Foundation, during which there has been serious deterioration of the buildings and art work and greatly diminished value of the endowment. We cannot predict the future and a reserve of two or three million dollars in the restoration account is small protection against future, probably escalating, costs of maintenance and restoration required by the trust indenture.

For the above reasons and because of the approval by the Attorney General of Pennsylvania, which represents the people of Pennsylvania, the Per Curiam Order by this Court entered May 17, 1995 is hereby reaffirmed.